UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEVONTE BURKS,

                         Plaintiff,

          – against –

DETECTIVE R. PERROTTA, POLICE OFFICER B.
SUKEENA, POLICE OFFICER M. EGAN, and
DETECTIVE L. BARTOLOTTI,

                         Defendants.

**OPINION AND ORDER**

 13-CV-5879 (ER)

Ramos, D.J.:

        Plaintiff Devonte Burks ("Plaintiff"), currently incarcerated and appearing *pro se*, brings

this action pursuant to 42 U.S.C. § 1983 alleging that his civil rights were violated during his

arrest and post-arrest questioning at the City of Poughkeepsie Police Department building.

Compl., Doc. 2.  Specifically, Plaintiff alleges that Police Officers B. Sukeena ("Sukeena") and

M. Egan ("Egan") violently dragged and beat him on the head with a flashlight during his arrest.

Compl. at 2.  He further alleges that Detectives R. Perrotta ("Perrotta") and L. Bartolotti

("Bartolotti") denied him the opportunity to receive prompt medical attention and persisted in

questioning him despite his visible suffering.  *Id.* at 4-5.  The Court reads these allegations as

raising claims for (1) the use of excessive force and (2) an unconstitutional delay in providing

Plaintiff with access to necessary medical care.[1]

        Plaintiff brings suit against Sukeena, Egan, Perrotta, and Bartolotti (together,

"Defendants") in their individual and official capacities, seeking damages in an amount of

---

[1] Defendants concur in the Court's interpretation of the Complaint, and Plaintiff has not disputed that interpretation.

$12.7 million.  *Id.* at 6.  Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Defs.' Mot. Summ. J., Doc. 43.

For the reasons discussed below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I.   Background[2]

Poughkeepsie police officers Sukeena and Egan arrested Plaintiff and another suspect, Michael Armstrong ("Armstrong"), early in the morning on August 21, 2010 in response to a call that an armed robbery and shooting had occurred.  Compl. at 3; Defs.' Mem. L. Supp. Mot. Summ. J, Doc. 44 at ¶ 3.  In his Complaint, Plaintiff claims that, during the course of his arrest, Sukeena and Egan dragged him by his ankles, slammed him on his chest, kicked him, and beat him on the head with a flashlight, causing him to temporarily lose consciousness.  Compl. at 3-4.[3]  Plaintiff also claims that the officers punched him in the face as they removed him from the police car when they arrived at the police station.  *Id.* at 4.  Plaintiff maintains that he was not resisting arrest.  *Id.* at 3.

---

[2] The following facts are undisputed except where otherwise noted.  As this summary makes clear, there are relatively few undisputed facts in this case.  The Court therefore provides the basic facts here and will further take up additional, disputed facts in the discussion that follows.

[3] Plaintiff addressed the facts asserted in Defendants' Rule 56.1 Statement, Doc. 46, in an opposing statement as required by Local Civil Rule 56.1.  *See* Pl.'s Rule 56.1 Stmt., Doc. 50.  However, he raises several additional material facts that are in dispute in his opposing memorandum, Pl.'s Mem. L. Opp. Defs.' Mot. Summ. J., Doc. 51, and a declaration, Burks Decl., Doc. 49.  Because Plaintiff is proceeding *pro se*, the court has performed an independent review of the entire record submitted by the parties to determine whether there are disputed issues of material fact.

Defendants tell a different story.[4]  Defendants claim that Plaintiff "attempted to elude" responding officers and was found hiding under a porch.[5]  Doc. 44 at ¶ 3.  According to Defendants, Plaintiff refused a demand to show his hands and the arresting officers had to remove him from beneath the porch in order to ensure that he was unarmed.  *Id*.  Defendants also point to the fact that Plaintiff told Perrotta and hospital personnel that a third individual involved the robbery, and not the arresting officers, had struck him in the head with a gun.  Doc. 44 at ¶ 7; Doc. 46 at ¶ 2.

The parties' accounts also diverge as to what occurred during Plaintiff's interrogation by Detectives Perrotta and Bartolotti.  Plaintiff claims that he slipped in and out of consciousness and repeatedly requested medical attention for his injuries during the interrogation.  Compl. at 6.  Plaintiff further alleges that Perrotta and Bartolotti were aware of his injuries, Burks Decl., Doc. 49 at ¶¶ 13-14, and nevertheless insisted on finishing their interrogation before seeking medical assistance.  Compl. at 6.  Meanwhile, Defendants maintain that Plaintiff's injury was imperceptible to the detectives because of his "Afro" hairstyle.  Doc. 44 at ¶ 4.

---

[4] Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Rule 56 must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local R. 56.1(a).  Defendants' Rule 56.1 Statement is certainly short and concise, consisting in its entirety of eleven paragraphs over three pages.  Remarkably, however, despite the fact that this case concerns an allegation of excessive force at the time of arrest, Defendants' Rule 56.1 statement does not contain any facts, much less facts purported to be undisputed, pertaining to the details of Plaintiff's arrest.  *See* Defs.' Rule 56.1 Stmt., Doc. 46.  Defendants' account of the circumstances of the arrest is detailed in their Memorandum of Law in support of their Motion.

[5] In his deposition, Plaintiff admitted that he ran when he heard police sirens because he was scared.  Kelly Affirm'n, Doc. 45, Ex. E at 44:8-12, July 22, 2014.  However, he also claimed to have put his hands up when the officers asked him to do so.  *Id*. at 50:7-10.

3

The parties do not dispute that, eventually, Plaintiff was taken to the hospital where he was treated for his wounds.[6]  *Id*.; *see also* Doc. 49 at ¶ 28.  The parties agree that he sustained a laceration to the head, which required two staples to close.  *See* Compl. at 4;[7] Defs.' Rule 56.1 Stmt., Doc. 46 at ¶ 6.  Plaintiff also claims that his forearms, wrist, and fingers were swollen. Compl. at 4.  In addition, Plaintiff maintains that he continues to suffer from memory loss and headaches.  *Id*. at 30.

As relevant to the instant motion, Defendants provide the Court with three discs containing video recordings of the interrogation of Plaintiff, by Detectives Perrotta and Bartolotti.[8]  *See* Kelly Affirm'n, Doc. 60, Exs. L-N.  The interrogation took place over several hours in at least two different sessions.  One session occurred before Plaintiff was taken to the hospital for treatment, and one after he was brought back to the station.  Plaintiff's private conversations with his mother and stepfather, who visited him at the police station both before and after he was taken to the hospital, are dispersed throughout these recordings.  Defendants only transcribed the contents of the third disc, which contain the portion of Plaintiff's interrogation and discussions with his parents that occurred after he had returned from the hospital.  *See id*. at Ex. F.

---

[6] Defendants estimate that Plaintiff was taken to the hospital approximately two hours and forty-five minutes into the interrogation and arrived at the hospital at 6:59 a.m.  Doc. 46 at ¶ 4.  Plaintiff's account tracks this timeline, stating that he was taken to the hospital after "several hours" of interrogation at 6:45 a.m.

[7] Given the numerous unnumbered attachments to the Complaint, the Court's citations to them refer to the page numbers reflected on ECF.

[8] Both Perrotta and Bartolotti admitted to interrogating Plaintiff on the morning of August 21, 2010. Pl.'s Mem. L. Opp. Defs.' Mot. Summ. J., Doc. 51, Exs. E at ¶ 1, F at ¶ 2, K at ¶ 1, L at ¶ 3.

## II.    Legal Standard on Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). Conversely, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted). However, in opposing a motion for summary judgment, the non-moving party may not

rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts[.]"  *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) (internal quotation mark omitted).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

The Second Circuit has made clear that "special solicitude should be afforded [to] pro se litigants generally, when confronted with motions for summary judgment."  *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).  *Pro se* litigants' submissions are "held 'to less stringent standards than formal pleadings drafted by lawyers[.]'"  *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Young v. N.Y.C. Dep't of Educ.*, No. 09 Civ. 6621, 2010 WL 2776835, at *5 (S.D.N.Y. July 13, 2010) (noting that the same principles apply to briefs and opposition papers filed by *pro se* litigants).  Although "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law,'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)), courts read the pleadings and opposition papers submitted by *pro se* litigants "liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).  "However, a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Lee v. Coughlin*,

902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.   Discussion

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). Thus, a civil rights action brought under § 1983 will stand only insofar as a plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)). The parties do not dispute that Defendants were acting under the color of state law. Therefore, the Court need only address whether Plaintiff was deprived of a constitutional right, based on the undisputed facts.

### A.   Excessive Force Claim

The Court reads Plaintiff's Complaint as bringing a § 1983 excessive force claim against Sukeena and Egan. Compl. at 3-4. "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 140 (1979)). In *Graham*, the Supreme Court determined that excessive force claims that arise "in the context of an arrest or investigatory stop of a free citizen" are "most properly characterized as . . . invoking the protections of the Fourth Amendment." *Id.* Under the Fourth Amendment, the Court must engage in an exclusively objective analysis of the

7

reasonableness of the Defendant's actions, merely assessing "whether the officers acted reasonably in light of the facts and circumstances of the situation they faced, without regard to their underlying motives or subjective intent toward the suspect." *Anderson v. Branen*, 17 F.3d 552, 559 (2d Cir. 1994) (citing *Graham*, 490 U.S. at 397).  The court is barred from considering subjective factors.  *See id*.

The court must conduct a case and fact specific inquiry, which "requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004)).  Its analysis should be guided by at least three factors:  (1) "the nature and severity of the crime leading to the arrest," (2) "whether the suspect pose[d] an immediate threat to the safety of the officer or others," and (3) "whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham*, 490 U.S. at 396).  The Supreme Court has instructed courts to evaluate the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," keeping in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396- 397.

It is indisputable that the crime which led to Plaintiff's arrest—armed robbery—was extremely serious.  Given that the officers were told that shots had been fired, they had every reason to fear for their safety.  *See* Pl.'s Mem. L. Opp. Defs.' Mot. Summ. J., Doc. 51, Ex. H at ¶ 24.  However, the record reveals significant disputes of material fact regarding what occurred after the officers caught up with Plaintiff and Armstrong.  In his response to Plaintiff's

8

interrogatories, Sukeena indicated that the officers found Plaintiff hiding under the stairs of a building, *id.* at ¶ 12, and "refused to comply with lawful orders to show the officers his hands[.]"[9] *Id.* at ¶ 24.  In contrast, Plaintiff maintains that he laid on the ground and showed his hands when the officers asked him to.  Doc. 49 at ¶ 5.  In a statement attached to his Complaint, Plaintiff alleges that the officers dragged him by the ankles, picked him up, slammed him on the chest, and began to beat him with a flashlight, which caused him to lose consciousness.  Compl. at 31.  When he regained consciousness, Plaintiff claims he was handcuffed.  *Id.*  The officers allegedly began to kick him, asking him "where is it?," presumably referring to a gun, and threatened to take him in the alley and beat him up.  *Id.*  Plaintiff argues that the force used by Sukeena and Egan was unnecessary and therefore excessive because he was either not resisting, unconscious or handcuffed.[10]  Doc. 49 at ¶ 7; *see also* Doc. 51 at 1.  Consequently, there are disputed issues of material fact concerning both the extent to which Plaintiff resisted arrest and the degree of force Sukeena and Egan applied in arresting him.

In the instant motion, Defendants rely primarily on "multiple statements" made by Plaintiff that he was hit by a third individual involved in the robbery to argue that his allegations against the police are inherently incredible.  Doc. 44 at ¶ 23.  Specifically, Defendants note that during a recorded conversation between Plaintiff and his mother, he told her that the police caught him running in part because he was trying to escape from someone who had hit him on

---

[9] In response to Plaintiff's interrogatories, Sukeena further stated that "[i]n order to determine if plaintiff was armed and assessed the officers [sic] safety it was necessary to use reasonable force to compel plaintiff to show his hands." Doc. 51, Ex. H at ¶ 24.  Egan denies using physical force during Plaintiff's arrest and claims that he was not the officer who put him in handcuffs.  Doc. 51, Ex. I at ¶¶ 11, 21.

[10] Plaintiff also relies on a complaint brought against Egan by a different prisoner claiming excessive force with regards to a separate arrest.  *See* Doc. 51, Ex R.  Besides the fact that the separate complaint against Egan has no bearing on the case at hand, a jury ultimately found Egan and the other defendants in that case not guilty after trial. *See Gallardo v. Egan et al.*, No. 10-CV-8922.

the back of the head after trying to force him to take the gun that was used in the robbery.  Kelly Affirm'n, Doc. 45, Ex. F at 24:17-19; *see also id*. at 26:18-22.[11]  Moreover, Plaintiff's medical records reveal that he told the hospital staff that he was "hit in the back of the head with a gun" and "remembers being hit and running away."  Kelly Affirm'n, Doc. 45, Ex. G at 1, 3.  However, those records do not reflect whether Plaintiff identified the person who hit him.

Defendants argue that a court should grant summary judgment "when a party raises only fain [sic] issues of fact."[12]  Doc. 44 at ¶ 31.  However, Defendants merely refer to non-binding New York State court decisions.  *See id.*  The only binding authority that the Court identified which arguably supports the proposition that summary judgment is appropriate where a plaintiff relies only on his own inherently incredible testimony is *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005).  In *Jeffreys*, the Second Circuit held that the district court did not err in granting summary judgment where it found nothing in the record to support plaintiff's allegation other than his own "contradictory and incomplete testimony" and determined that no reasonable person could believe the plaintiff.  *Id*. at 555.  Yet, in that case the Second Circuit acknowledged that it was presented with a "rare circumstance" and "it is undoubtedly the duty of district courts *not* to weigh the credibility of the parties at the summary judgment stage[.]"  *Id*. at 554 (emphasis added).  The Circuit Court further noted that "the moving party still must meet the

---

[11] Defendants also cite to a portion of the record in which Plaintiff's mother informed the detectives that Plaintiff was "hit in the head by the other guy" and "didn't want to take the gun."  Kelly Affirm'n, Doc. 45, Ex. F at 78:12.  This statement constitutes inadmissible hearsay and therefore cannot be relied upon in a motion for summary judgment.

[12] In his deposition, Plaintiff stated that he did not shoot the robbery victim.  Kelly Affirm'n, Doc. 45, Ex. E at 35:18-20.  Defendants present several pieces of evidence contradicting that statement to support their argument that Plaintiff either perjured himself during his plea allocution or in his deposition.  *See* Doc. 44 at ¶ 8.  Plaintiff's statements are certainly disconcerting given that he allocuted to "accidentally" shooting the victim.  *See* Kelly Affirm'n, Doc. 45, Ex. J at 28-29.  However, neither his culpability nor his credibility are relevant to the Court's determination of Defendants' motion for summary judgment.

difficult burden of demonstrating that there is no evidence in the record upon which a reasonable

factfinder could base a verdict in the plaintiff's favor."  *Id.*

Defendants have not met this difficult burden.  In his opposition, Plaintiff claims that, at

the time he made the above statements, he was suffering from a severe headache and had gone

numerous hours without food or sleep.  Doc. 51 at 5.  In his deposition, Plaintiff explained that

he told his mother that he was hit in the head with a gun by an individual involved in the robbery

because he was "emotionally disturbed during that time" and may have said things that he was

"not aware of."  Kelly Affirm'n, Doc. 45, Ex. E at 83:17-19.  The Court has independently

reviewed the video recordings of Plaintiff's interrogation by Defendants Perrotta and Bartolotti

and it is evident that, during his interrogation and in his conversation with his mother, Plaintiff

did not articulate a clear, definitive account of how he sustained the wound to his head.  At one

point during the interrogation, Plaintiff appeared bewildered by the fact that his head was

bleeding and stated that he did not know what had happened to him.  Kelly Affirm'n, Doc. 60,

Ex. L at 1:13:10.[13]  In addition, Plaintiff told his mother that he was hit in the head, first saying

that he could not remember what happened, then telling her that he was "pistol-whipped," and

later stating that he no longer remembered anything.  *Id.* at 1:52:42, 1:54:39, 1:54:53.  He did

not, however, state who had "pistol-whipped" him.  When asked by his mother whether another

individual involved in the robbery hit him on the head, Plaintiff responded, "I got hit I would

suspect . . . let me try to think first."  Kelly Affirm'n, Doc. 45, Ex.  F at 18:11-12, 17-18.

In *Jeffreys*, the Second Circuit cautioned that "[i]f there is a plausible explanation for

discrepancies in a party's testimony, the court considering a summary judgment motion should

---

[13] Given that Defendants have not transcribed these portions of the recordings, the Court cites to the timestamp at
which excerpts begin on the particular exhibit.

11

not disregard the later testimony because of an earlier account that was *ambiguous, confusing, or simply incomplete*."[14]  *Jeffreys*, 426 F.3d at 555 n.2 (alterations and emphasis in original) (quoting *Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir.) *amended*, 169 F.3d 782 (2d Cir. 1998)).  The record here demonstrates that Plaintiff's earlier accounts of what happened on the morning of his arrest were, at the very least, ambiguous and confusing.  Plaintiff has offered a plausible explanation for these inconsistencies—which is arguably supported by the interrogation recordings—that he was confused as a result of the injury he suffered to his head and the circumstances of his interrogation.  Construing the evidence cited above in the light most favorable to Plaintiff, a reasonable juror could find that Sukeena and Egan, and not a third robber, caused Plaintiff's injuries.  In any event, even if another person caused his head injury, a question of fact still exists concerning the force that was used in effecting his arrest.  Plaintiff states that he was dragged on his stomach, struck on the head, kicked, punched, and stomped on during the course of his arrest, even after he was handcuffed.  Compl. at 29.  Plaintiff's current version of how he sustained his injuries is not so thoroughly disproven by the record that the Court may reject it as a matter of law.

The Second Circuit has held that allegations involving a comparable use of force used during the arrest of a submissive suspect were sufficient to allow a reasonable factfinder to conclude that the force used was excessive.  *See Amnesty*, 361 F.3d at 123-24.  *Amnesty* involved allegations of the use of excessive force by police to effectuate the arrest of nonviolent suspects, which included "lifting and pulling plaintiffs . . . by pressing their wrists back against their

---

[14] It is also important to note that, in *Jeffreys*, the Second Circuit emphasized that the plaintiff was solely relying on his own contradictory statements.  *See Jeffreys*, 426 F.3d at 555.  Here, by contrast, Plaintiff relies on his statements, his mother's affidavit, the medical records and the interrogation recordings, all of which arguably support his claim.

forearms in a way that caused lasting damage;" "throwing [a plaintiff] face-down to the ground;"

"dragging [another plaintiff] face-down by his legs, causing a second-degree burn on his chest;"

"placing a knee on [a plaintiff's] neck in order to tighten his handcuffs while he was lying face-

down;" and "ramming [a plaintiff's] head into a wall at a high speed." *Id*. at 123.  The Circuit

Court reversed the grant of summary judgment to the defendant, finding that "a reasonable jury

could also find that the officers gratuitously inflicted pain in a manner that was not a reasonable

response to the circumstances[.]"[15]  *Id*. at 124; *see also De Michele v. City of New York*, No. 09

CIV. 9334 (PGG), 2012 WL 4354763, at *14 (S.D.N.Y. Sept. 24, 2012) (denying summary

judgment to defendants where plaintiff claimed police repeatedly stomped on his bare feet, drove

his head into the brick wall, punched him in the ribs, threw him onto the floor face-forward, and

then picked him up by the handcuffs attached to his wrists during his arrest for armed robbery).

Defendants also urge the Court to grant summary judgment in their favor because

Plaintiff cannot identify Egan and Sukeena as the responsible parties.  Doc. 55 at ¶¶ 18-20.  They

argue that it is not enough that Plaintiff claims to have heard their names and seen them listed as

his arresting officers on police reports.  *Id*. at ¶ 19.  However, "an arrestee's inability to

positively identify those who allegedly violated his rights is not *per se* fatal to his claims."  *De*

*Michele*, 2012 WL 4354763, at *16 (internal citation and quotation marks omitted).  This is

particularly the case when "the acts complained of . . . if true . . . are likely to have prevented

plaintiff from identifying which [officers] specifically engaged in the bad acts."  *Id*. (internal

---

[15] The plaintiffs in *Amnesty* were arrested while participating in an anti-abortion demonstration.  *Amnesty*, 361 F.3d at 118.  They "employed 'passive resistance' techniques to impede their arrest, including going limp, refusing to identify themselves, and refusing to unlock the chains that they had used to bind themselves together."  *Id*.

citation and quotation mark omitted).  To the extent it is even admissible,[16] Sukeena's report

does identify multiple other officers who were at the scene of Plaintiff's arrest.  *See* Doc. 55,

Ex. O.  However, it is undisputed that both he and Egan were among those officers present.  *See*

Doc. 51, Exs. H-J.  Moreover, Sukeena's argument in this regard is particularly meritless

because he admits to having personally used force to effect Plaintiff's arrest.  Doc. 51, Ex. H at

¶ 24.  The questions of whether the force used to arrest Plaintiff was excessive and by whom that

force was used constitute disputed issues of fact that require credibility determinations that

preclude summary judgment.  *See Hattar v. Carelli*, No. 09 CV 4642 (VB), 2012 WL 246668, at

*3 (S.D.N.Y. Jan. 11, 2012) (denying summary judgment despite the fact that the plaintiffs could

not identify any specific individual officer who used excessive force).  Furthermore, the Court

notes that "[i]t is widely recognized that all law enforcement officials have an affirmative duty to

intervene to protect the constitutional rights of citizens from infringement by other law

enforcement officers in their presence." *Usavage v. Port Auth. of New York & New Jersey*, 932

F. Supp. 2d 575, 599 (S.D.N.Y. 2013) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.

1994)).  Thus, even if Egan did not place his hands on Plaintiff, he may yet be liable for having

failed to intervene.

 Ultimately, Defendants are asking the Court to grant summary judgment on the basis that

Plaintiff is not credible.  This is precisely the type of fact-finding that the Court is precluded

from undertaking at the summary judgment phase.  Whether Plaintiff will be able to successfully

*prove* his case beyond a preponderance of the evidence is a question for another day.  For

---

[16] The Federal Rules of Evidence's advisory committee notes indicate that "police reports have generally been
excluded except to the extent to which they incorporate firsthand observations of the officer."  Fed. R. Evid. 803(8)
advisory committee's note (c).

purposes of the instant motion, however, the state of the record is such that the Court must deny Defendants' request for summary judgment on Plaintiff's excessive force claim.

## B. Delay in Providing Medical Assistance Claim

The Court interprets Plaintiff's Complaint as bringing a § 1983 claim alleging an unconstitutional delay in providing access to medical care against Perrotta and Bartolotti. Compl. at 5-6.  There is no indication that Plaintiff had been arraigned before he ultimately received medical care for his head wound.  In *Lewis v. Clarkstown Police Dep't*, No. 11 CIV. 2487 (ER), 2014 WL 6883468, at *5-6 (S.D.N.Y. Dec. 8, 2014), this Court previously determined that the Fourth Amendment should apply to pre-arraignment denial of medical care claims such as the one presented here.  It reasoned that, although the Second Circuit has not directly addressed the issue, the fact that courts in this circuit routinely apply the Fourth Amendment to excessive force claims that arise between the time of arrest and arraignment, denial of medical care claims that arise during this same interval should be treated similarly.  *Id.*

Under the Fourth Amendment standard, the court must decide "whether the asserted denial of medical treatment was objectively unreasonable 'focusing on the circumstances confronting the police at the time of the arrest without regard to their underlying motives or attitude towards the suspect[.]'"[17]  *Freece v. Young*, 756 F. Supp. 699, 701 (W.D.N.Y. 1991) (quoting *Miller v. Lovett*, 879 F.2d 1066, 1070 (2d Cir. 1989)).  The Seventh Circuit has identified four factors that are relevant to assessing the objective reasonableness of an officer's

---

[17] In contrast, denial of medical care claims that arise under the Fourteenth and Eighth Amendments are subject to the deliberate indifference standard.  *See Caiozzo v. Koreman*, 581 F.3d 63, 69-72 (2d Cir. 2009).  The deliberate indifference analysis contains *both* objective and subjective prongs.  *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  This means that the plaintiff must not only show that the alleged deprivation was "sufficiently serious," *id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)), he must also demonstrate that "the charged official . . . act[ed] with a sufficiently culpable state of mind."  *Id.* (citing *Wilson*, 501 U.S. at 298).  In their papers, Defendants apply the deliberate indifference standard to Plaintiff's claim arising from a delay in medical care.  Doc. 44 at 5.

conduct in the denial of medical care context:  (1) whether the officer had notice of the arrestee's medical need "by word. . . or through observation of the arrestee's physical symptoms[;]" (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) law enforcement's interests, including administrative, penological, or investigatory concerns. *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007) (internal citations omitted).

Defendants argue that Plaintiff's head injury was neither observable to the officers nor was it sufficiently serious to warrant liability.  Doc. 55 at ¶ 2.  As to their first contention, Defendants assert that the cut on the back of Plaintiff's head was "concealed" by his "Afro hairstyle."  Doc. 44 at ¶ 4.  Indeed, one of the few facts that Defendants' listed in their otherwise barebones Rule 56.1 Statement is that "[d]uring plaintiff's interview, there was *no injury to plaintiff that was observable*."  Doc. 46 at ¶ 4 (emphasis added).  Perrotta and Bartolotti's responses to Plaintiff's requests for admissions support this claim.[18]  Doc. 51, Ex. E at ¶¶ 5, 7, 11; Doc. 51, Ex. K at ¶¶ 5, 10, 13 (emphases in original).  However, Defendants' assertion that Plaintiff's injuries were completely imperceptible is directly contradicted by the record— specifically, by portions of Plaintiff's interrogation which Defendants failed to acknowledge or transcribe.  The Court's independent review of all of the recordings that Defendants submitted revealed that, earlier in Plaintiff's interrogation, one of the detectives asked him how he "got the shiner" on his face and where the blood on his pants came from.  Plaintiff responded that it was from when he was "arrested and stuff."  Kelly Affirm'n, Doc. 60, Ex. L at 36:08.  Later on, one of the detectives observed that Plaintiff's head was bleeding a lot.  *Id.* at 1:13:10.

---

[18] Perrotta and Bartolotti both deny that they saw or were aware that Plaintiff was bleeding from the head.  Doc. 51, Ex. E at ¶¶ 5, 7, 11; Doc. 51, Ex. K at ¶¶ 5, 10, 13.

Defendants also point to the fact that the photos and videotape of Plaintiff did not reveal any lacerations, swelling, or abrasions.  Doc. 44 at ¶¶ 41-42.  The video quality of the camera footage, along with the camera angle, does not allow the Court to make such a determination.  Only one photograph of Plaintiff is included in the record and, while Plaintiff appears uninjured, it is unclear when it was taken and it only portrays his front side from the waist up.  Kelly Affirm'n, Doc. 45, Ex. H.  Regardless, "[b]ruises and lacerations alone are generally insufficient to support a claim of constitutional deprivation."  *McClendon v. Cnty. of Nassau*, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *6 (E.D.N.Y. Oct. 11, 2012) (collecting cases).  For example, in *Porter v. Goord*, No. 04-CV-0485F, 2009 WL 2180580, at *11-12 (W.D.N.Y. July 22, 2009), the plaintiff alleged that his head wound was "bleeding profusely" and the evidence established that he had "a dime-sized bump on the top of his head, a quarter-inch laceration on his lower lip, and a one-inch laceration on the back of his neck."  Nonetheless, the court granted summary judgment in the defendants' favor, concluding that "the record is devoid of any evidence establishing that Plaintiff's injuries . . . constituted a serious medical condition for which the denial of adequate treatment could result in further significant injury or the unnecessary and wanton infliction of pain."  *Id*. at *12 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)) (internal quotation marks omitted).

Of more concern is Plaintiff's additional claim that he "continually slipped in and out of consciousness" while Perrotta and Bartolotti persisted in questioning him.  Compl. at 6.  Indeed, other courts have found that the loss of consciousness is sufficiently serious to satisfy the objective inquiry into the reasonableness of an officer's conduct.  *Thompson v. Delvalle*, No. 07 CIV. 4691 (BSJ), 2010 WL 2505638, at *4 (S.D.N.Y. June 21, 2010);[19] *see also Warren v. City*

---

[19] The *Thompson* court went on to dismiss the plaintiff's denial of medical care claim for failure to allege that the defendants acted with a culpable state of mind.  *Thompson*, 2010 WL 2505638, at *4.  However, in contrast to the

17

*of Waterbury*, No. 3:09 CV 01616 (AWT), 2012 WL 827051, at *7 (D. Conn. Mar. 9, 2012)

(denying summary judgment to defendants where plaintiff contended that his symptoms were

consistent with a head injury, "which should be regarded as a serious medical condition").

However, the recording of Plaintiff's interrogation belies his claim that he was continuously

losing consciousness while he was questioned.  As part of the Court's independent review of the

recordings submitted by Defendants, it observed that Plaintiff was completely lucid and

responsive to Perrotta and Bartolotti's questioning for nearly the entire interrogation.  It is not

until over an hour into his questioning that Plaintiff exhibited any signs of confusion or

incoherence.  At this point, one of the detectives asked him several times "what's the matter?," to

which Plaintiff merely responded "hmm?"  Kelly Affirm'n, Doc. 60, Ex. L at 1:16:30.  The

detective ceased questioning at this time and left Plaintiff alone in the room until his mother

arrived.

Given the fact that Plaintiff never requested medical assistance or complained that he was

in pain, together with his composure throughout most of the interrogation, the detectives did not

act unreasonably in their failure to seek medical care.  Once Plaintiff's mother spoke to the

detectives, they immediately agreed to call an ambulance.  *Id*. at 1:53:17.  In addition, although

Plaintiff claims that he repeatedly requested medical attention during the interview, Compl. at 5,

the recording of the interrogation does not reveal a *single* instance in which Plaintiff requested

medical care.  *See* Kelly Affirm'n, Doc. 60, Ex. L.  Furthermore, when the paramedics arrived,

Plaintiff initially resisted going to the hospital.  *Id*. at 2:15:44.

---

instant case, in *Thompson*, the plaintiff lost consciousness while he was in a holding cell and alleged "no facts that
Defendants knew or were warned of any symptoms that would signify a potential loss of consciousness or other
serious injury."  *Id.*  Regardless, the subjective prong of the deliberate indifference standard is not relevant here.

It is undisputed that Plaintiff was eventually taken to the hospital.  Doc. 46 at ¶ 4; Doc. 49 at ¶ 28.  The line of cases involving the objective prong of Eighth Amendment delay in medical care claims is instructive here.  The Second Circuit has instructed courts to "focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious[.]"  *Bilal v. White*, 494 F. App'x 143, 145 (2d Cir. 2012) (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)) (internal quotation marks omitted) (emphases in original).  Under this analysis, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant[.]"  *Smith*, 316 F.3d at 186.  The "actual medical consequences that flow from the alleged denial of care" are considered "highly relevant to the question of whether the denial [or delay] of treatment subjected the prisoner to a significant risk of serious harm."  *Id*. at 187.

Here, Plaintiff merely claims that he has "memory problems to this day" as a result of Perrotta and Bartolotti's failure to provide him with immediate medical care.[20]  Compl. at 6.  However, beyond these conclusory statements, Plaintiff has not introduced any evidence nor alleged additional facts that connect his memory loss with the delay he experienced in receiving medical treatment.  Although he submitted medical records indicating that he suffers from headaches, blurred vision, neck pain, and loss of consciousness, he does not attempt to show that these symptoms are attributable to the delay in medical care, as opposed to the alleged assault. *See Horvath v. City of New York*, No. 12 CV 6005 (RJD) (JMA), 2015 WL 1757759, at *6

---

[20] In his deposition, Plaintiff also stated that, had he received medical attention earlier, he would not have "bled out as much." Kelly Affirm'n, Doc. 45, Ex. E at 105:12-18.  However, he does not claim that it had a resulting adverse effect on him.

19

(E.D.N.Y. Apr. 17, 2015) (granting summary judgment for defendants in part because, while the plaintiff offered evidence of a number of injuries resulting from the alleged assault, he did not connect those injuries to the alleged delay in medical attention).

Meanwhile, the record actually contradicts any suggestion that his condition worsened during the delay.  His medical chart from that morning indicates that, by the time he was examined by hospital staff, his neurological system and vision were functioning normally.  Kelly Affirm'n, Ex. G at 4-5.  It further states, "the patient is alert and oriented to person, place, time and circumstance . . . normal motor skills, normal gait and normal sensation." *Id*. at 5.  In short, the record does not show that, from an objective standpoint, Perrotta and Bartolotti's conduct "significantly increased [Plaintiff's] risk for medical injury or similar serious adverse consequences." *Wright v. Genovese*, 694 F. Supp. 2d 137, 159 (N.D.N.Y. 2010) *aff'd*, 415 F. App'x 313 (2d Cir. 2011) (applying the Eighth Amendment standard).  Therefore, Defendants' motion for summary judgment is granted with respect to Plaintiff's claims of delayed medical care against Perrotta and Bartolotti.

### C.  Qualified Immunity

Defendants argue that the doctrine of qualified immunity shields Defendants from liability.  Doc. 44 at ¶¶ 38-39.

A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where the conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken. *Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (internal citations omitted).

As the Second Circuit explained in *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012), qualified

immunity "affords government officials breathing room to make reasonable—even if sometimes

mistaken—decisions, and protects all but the plainly incompetent or those who knowingly

violate the law from liability for damages." (internal citations and quotation marks omitted).

Therefore, "[w]hether qualified immunity applies in a particular case generally turns on the

objective legal reasonableness of the challenged action, assessed in light of the legal rules that

were clearly established at the time it was taken." *Id.* (internal quotation marks and citations

omitted). Under a qualified immunity analysis, a court should first decide whether the facts that

a plaintiff has alleged make out a violation of a constitutional right, and then whether the right at

issue was clearly established at the time of defendant's alleged misconduct. *Pearson v.*

*Callahan*, 555 U.S. 223, 232 (2009). Nonetheless, it may exercise its "sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case at hand." *Id.* at 236.

      With respect to Fourth Amendment excessive force claims, courts in this Circuit have

made clear that, "[s]ince the law in this area is well-established . . . the qualified immunity

inquiry is the same as the inquiry made on the merits." *Washpon v. Parr*, 561 F. Supp. 2d 394,

407-08 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). As noted above, there

are several disputed issues of material fact with respect to the merits of Plaintiff's excessive

force claim. Thus, the Court is also unable to determine whether Sukeena and Egan's actions

were objectively reasonable in light of the legal rules that were clearly established at the time it

was taken. Such a determination requires credibility determinations that are the province of a

jury.

      To the extent that Defendants' motion for summary judgment is premised on a qualified

immunity defense, it is denied.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  Plaintiff's delay in medical care claims are dismissed as to Perrotta and Bartolotti; his Fourth Amendment excessive force claim against Sukeena and Egan survives. Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Opinion and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is respectfully directed to (1) terminate Perrotta and Bartolotti as defendants in this case, and (2) terminate the pending motion, Doc. 43.

The parties shall appear for a pretrial conference on **June 25, 2015 at 10:00 a.m.**, at which time the Court will set a trial date, a final pretrial conference date, and a schedule for all pretrial filings.  Defendants' counsel shall appear in person for the conference, and Plaintiff shall appear telephonically.

It is SO ORDERED.

Dated:     May 15, 2015
           New York, New York

                                          Edgardo Ramos, U.S.D.J.

22